[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Brown*, Slip Opinion No. 2022-Ohio-4347.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4347

THE STATE OF OHIO, APPELLANT, *v.* BROWN, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Brown*, Slip Opinion No. 2022-Ohio-4347.]**

*Criminal law—R.C. 2913.42(A)(1)—Tampering with records—Litigation privilege—The common-law litigation privilege does not shield a person from criminal liability for tampering with records in violation of R.C. 2913.42(A)(1)—Litigation privilege applies to civil suits only for defamatory statements made during judicial proceedings that were reasonably related to those proceedings—Court of appeals' judgment reversed and cause remanded for that court to address assignments of error not previously reached.*

(No. 2021-0392—Submitted March 9, 2022—Decided December 7, 2022.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-190399, 2021-Ohio-597.

_____

**FISCHER, J.**

{¶ 1} Appellee, Monai Sherea Brown, filed a bogus quiet-title action against a homeowner in Cincinnati to take possession of his home. Appellant, the state of Ohio, prosecuted Brown for criminal offenses related to her filing of that civil case. Brown was convicted of tampering with records in violation of R.C. 2913.42(A)(1), which prohibits a person from falsifying any writing or record "knowing the person has *no privilege* to do so." (Emphasis added.) The First District Court of Appeals reversed Brown's conviction, finding that her false statements were "privileged" because she made them in a judicial proceeding, 2021-Ohio-597, ¶ 25, and holding that those privileged statements could not form the basis of her tampering-with-records charge, *id.* at ¶ 26.

{¶ 2} We accepted the state's discretionary appeal to determine whether the rule of absolute privilege, also known as the litigation privilege, which was applied by the appellate court, precludes successful prosecution of a tampering-with-records charge. *See* 163 Ohio St.3d 1439, 2021-Ohio-1896, 168 N.E.3d 1195. We hold that the litigation privilege, which protects a person from civil liability for defamatory statements that were made during judicial proceedings and that were reasonably related to the proceedings in which they were made, does not shield a person from criminal liability related to those statements. Therefore, we reverse the judgment of the First District, and we remand the cause for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Brown files a quiet-title action against an unsuspecting homeowner

{¶ 3} Brown had never met Loie Hallug, the owner of 511 McAlpin Avenue, and had allegedly never stepped foot inside his home. Yet, on July 21, 2017, Brown filed a quiet-title action against Hallug seeking to take his home, as she had done to at least two other unsuspecting homeowners.

2

**{¶ 4}** Brown's complaint to quiet title against Hallug was fraught with inconsistencies and misrepresentations. Brown claimed to be the lawful owner of 511 McAlpin Avenue. Though she acknowledged that Hallug had once had an interest in the property, she alleged that Hallug had lost his interest in the property when he failed to pay his mortgage and "permanently abandoned" his home. She recognized that the "original owners" would have superior rights to her own, but she claimed that Hallug's "non-use and permanent abandonment" of the property in combination with her "subsequent act of actual physical possession of said premises" resulted in a transfer of ownership to and possession of the property by her. However, in an affidavit attached to her complaint, Brown declared that Hallug was the lawful owner of 511 McAlpin Avenue. And while she claimed ownership of the property in her complaint, a fact she swore to be true, Brown asserted in an affidavit of indigency she filed in the quiet-title action that she did not own any property.

**{¶ 5}** Additionally, in her complaint filed in the Hamilton County Court of Common Pleas on July 21, 2017, Brown maintained that she had entered the property at 511 McAlpin Avenue to take possession of it. Brown stated that she "entered" the property on August 1, 2017—a date that was 11 days in the future. Not only had this date not yet occurred when Brown filed her complaint to quiet title, but the date of possession that Brown identified in her complaint was inconsistent with the declaration in her affidavit attached to the complaint in which she averred that she took possession of the property on July 31, 2017—a date that was ten days in the future.

**{¶ 6}** Brown asserted in her complaint that Hallug had been "personally notified" (boldface and underlining deleted) of her "claim of rights in ownership" of the property. She further stated in her affidavit that Hallug had been notified in a "letter of intent" sent "via certified mail" to 511 McAlpin Avenue of her intention to possess and occupy the property. Despite Brown's assertions in her complaint

and the attached affidavit that she had notified Hallug of her intent when she filed her complaint, she had not done so—a fact she later admitted at trial.

{¶ 7} Rather, six days after filing the quiet-title action against Hallug, Brown sent Hallug a letter of intent to acquire his property by "claiming title by right and/or adverse possession." In her letter, Brown demanded that Hallug pay her $733 for improvements to the property that she had never made. She also warned Hallug that if he did not respond to her demands, she may pursue legal action, even though she had already done so.

{¶ 8} Hallug received Brown's letter of intent on August 9, 2017. He thought Brown's letter was "ridiculous." Although Hallug's home had been vacant for two months in 2017 during his divorce proceedings and although he had experienced some financial difficulties that put his mortgage in arrears, Hallug eventually moved back into the home, and he worked with his mortgage lender to amend his mortgage. Brown did not make any improvements to Hallug's home while the property sat vacant. Her demands for monetary compensation for improvements made to the home were based on bogus factual assertions. Nevertheless, Hallug responded to Brown's letter of intent at the return address that was provided on the envelope, rejecting her request for money and her claims to his home. But Hallug's response never reached Brown; it was returned to sender.

{¶ 9} Soon thereafter, Hallug was served with Brown's complaint against him. Hallug also discovered that Brown had placed the water bill for 511 McAlpin Avenue in her name. Hallug paid an attorney $1,500 to represent him in the quiet-title action. Hallug's attorney filed a motion to dismiss Brown's complaint, which the common pleas court granted.

## B. Brown is charged with crimes related to her quiet-title action against Hallug

{¶ 10} The financial-crimes unit of the Cincinnati police department investigated Brown after discovering her connection with a family that had filed

4

several quiet-title actions, false mechanics' liens, and other legal documents against property owners in an effort to take their properties. A grand jury indicted Brown on charges of tampering with records kept by a governmental entity in violation of R.C. 2913.42(A)(1), theft in violation of R.C. 2913.02(A)(3), and unauthorized use of property in violation of R.C. 2913.04(A). Brown pleaded not guilty, waived her right to counsel, and proceeded pro se.

{¶ 11} At trial, the state presented witness testimony demonstrating that Hallug had been the owner of 511 McAlpin Avenue since 2014, that Hallug remained the owner as of the date of Brown's criminal trial in 2019, and that Hallug had never abandoned the property as Brown claimed in her complaint. Brown even admitted that some of the statements that she had made in her complaint were false.

{¶ 12} The state also elicited testimony from Brown in which she conceded that her affidavit of indigency included a false statement. Brown alleged in her affidavit of indigency that she had no assets and no income, and she signed the affidavit acknowledging that she was "subject to criminal charges for providing false information" therein. However, Brown admitted that she owned a vehicle when she filed her affidavit of indigency, but she failed to include it in the "[o]ther property" category of the assets section of the form.

{¶ 13} The jury found Brown guilty of tampering with records, acquitted her of unauthorized use of property, and could not reach a decision on the theft count. After receiving the verdicts for the tampering-with-records and unauthorized-use-of-property counts, the state dismissed the theft count. The trial court sentenced Brown to one year in prison and ordered her to pay restitution to Hallug in the amount of $1,500.

### C. The First District reverses Brown's conviction

{¶ 14} Brown appealed her conviction to the First District, raising three assignments of error. In her first assignment of error, she argued that her conviction was based on insufficient evidence because either she had a privilege to make false

statements during a judicial proceeding or the state did not prove that she knew she had no such privilege.

{¶ 15} The appellate court reversed Brown's conviction based on her first assignment of error, finding that there was insufficient evidence to support a tampering-with-records conviction because Brown's statements in the quiet-title action were "privileged" under the doctrine of absolute privilege, which shields a person from being held civilly liable for defamatory statements that person made in judicial proceedings so long as those statements bear a reasonable relation to those proceedings. 2020-Ohio-597 at ¶ 25. The court of appeals therefore reversed the trial court's judgment and discharged Brown without reaching her remaining assignments of error. *Id.* at ¶ 26-28.

## II. LAW AND ANALYSIS

{¶ 16} We accepted the state's discretionary appeal to consider the following proposition of law: "The public policy underlying the civil immunity relied upon by the First District does not support a similar application of criminal immunity." *See* 163 Ohio St.3d 1439, 2021-Ohio-1896, 168 N.E.3d 1195. We consider this issue in the context of a sufficiency-of-the-evidence challenge.

{¶ 17} Determining whether evidence is legally sufficient to support a verdict is a question of law that we review de novo. *See State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, 170 N.E.3d 813, ¶ 7. We determine whether the evidence presented at trial, "when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, ¶ 15.

{¶ 18} Under R.C. 2913.42(A)(1), a person is guilty of tampering with records when that person falsifies a writing or record "knowing the person has no privilege to do so, and with the purpose to defraud or knowing that the person is facilitating a fraud." This means that the state had to prove (1) that Brown falsified

a writing or record, (2) that Brown knew she did not have the privilege to do so, and (3) that Brown did so with the purpose to defraud or with the knowledge that she was facilitating a fraud. The issue in this case concerns the second element: Brown had to *know* that she *did not have the privilege* to falsify a writing or record.

### A. The litigation privilege

{¶ 19} We first deal with the issue of privilege. The General Assembly has defined "privilege" as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). The question in this case is whether the common-law rule of absolute privilege, also known as the litigation privilege, shields Brown from being criminally prosecuted for tampering with records. We hold that it does not, for two reasons: (1) the litigation privilege does not shield a person from being held *criminally* liable for making a defamatory statement in a judicial proceeding even when that statement bears a reasonable relation to the proceeding and (2) even if it did, at least one of the false statements Brown made in her filings in the quiet-title action against Hallug was not defamatory and thus cannot be protected by the litigation privilege.

### *1. History of the litigation privilege in Ohio*

{¶ 20} The litigation privilege is a deeply rooted common-law rule that protects individuals from defamation lawsuits. *See generally* Hayden, *Reconsidering the Litigator's Absolute Privilege to Defame,* 54 Ohio St.L.J. 985, 1012, 1014-1015 (1993). In the rule's infancy, "neither party, witness, counsel, jury [n]or Judge [could] be put to answer, civilly or criminally, for words spoken in office." *Rex v. Skinner*, 98 Eng.Rep. 529, 530, Lofft 55 (K.B.1772). This concept led to the development of the English rule regarding litigation privilege: "*[N]o action* will lie against a party to an action for any defamatory statement made by him in a pleading, either in civil or criminal proceedings, even though such statement is false and malicious, and even though irrelevant to the matter in issue."

(Emphasis added.) *Erie Cty. Farmers' Ins. Co. v. Crecelius,* 122 Ohio St. 210, 212-213, 171 N.E. 97 (1930). While the English rule regarding litigation privilege forms the basis of the American rule, the two differ significantly. *See id.* at 213; *Mauk v. Brundage*, 68 Ohio St. 89, 97-98, 67 N.E. 152 (1903); *Levy v. Littleford*, 19 Ohio Dec. 604, 605-606, 1909 Ohio Misc. LEXIS 29 (1909). The English rule, as explained above, is broad, *see Theiss v. Scherer,* 396 F.2d 646, 649 (6th Cir.1968); whereas the American rule, which was adopted by this court, limits the types of defamatory statements that are considered privileged and limits the circumstances in which the privilege applies. *See Surace v. Wuliger*, 25 Ohio St.3d 229, 231-233, 495 N.E.2d 939 (1986).

{¶ 21} Early on, this court acknowledged that there were many views on the litigation privilege, ranging from absolute privilege for *all statements* made during judicial proceedings, to all *relevant statements* made during judicial proceedings, to all *not false and malicious statements* made during judicial proceedings. *Lanning v. Christy*, 30 Ohio St. 115, 118-119 (1876). This court initially adopted the rule that "[n]o action will lie for any defamatory statement made by a party to a court proceeding, in a pleading filed in such proceeding, where the defamatory statement is material and relevant to the issue." *Erie Cty. Farmers' Ins. Co.* at syllabus. The court, recognizing the need to protect litigation participants from *defamation lawsuits*, adopted the rule. *Id.* at 215. Though the court specifically said that "[*n*]o action will lie" against a party for defamatory statements made in certain contexts, (emphasis added) *id.* at syllabus, the court emphasized that the litigation privilege would not shield a person from criminal prosecution for perjury or from an action for malicious prosecution, *id.* at 215.

{¶ 22} In *Surace*, this court clarified the rule announced in *Erie Cty. Farmers' Ins. Co.* and adopted the American rule: "As a matter of public policy, under the doctrine of absolute privilege in a judicial proceeding, a claim alleging that a defamatory statement was made in a written pleading does not state a cause

of action where the allegedly defamatory statement bears some reasonable relation to the judicial proceeding in which it appears," *Surace* at syllabus; s*ee also id.* at 232-233. Adopting the public-policy considerations that were discussed in *Erie Cty. Farmers' Ins. Co.*, this court acknowledged that the litigation privilege may " 'afford immunity to the evil disposed and the malignant *slanderer*' " but explained that the privilege was necessary to protect the administration of justice by preventing " 'a multitude of *slander and libel suits*' " and by encouraging " 'an honest suitor' " to pursue his or her legal remedies. (Emphasis added.) *Surace* at 232, quoting *Erie Cty. Farmers' Ins. Co.* at 215. Although the court expanded the litigation privilege in *Surace* to protect defamers from civil liability, it did not extend the privilege to protect them from criminal liability.

{¶ 23} Since *Surace*, this court has applied the litigation privilege to provide civil immunity to individuals who have made defamatory statements during judicial proceedings that were reasonably related to those proceedings. *See Hecht v. Levin*, 66 Ohio St.3d 458, 613 N.E.2d 585 (1993), paragraph two of the syllabus (a person who makes a relevant statement in an attorney-discipline proceeding enjoys an absolute privilege against a civil action for defamation); *M.J. DiCorpo, Inc. v. Sweeney*, St.3d 497, 634 N.E.2d 203 (1994), syllabus (an informant who provides an affidavit, statement, or other information to a prosecuting attorney when reporting the commission of a crime is entitled to an absolute privilege against civil liability for the statement made if it bears some reasonable relation to the criminal activity reported); *Reister v. Gardner*, 164 Ohio St.3d 546, 2020-Ohio-5484, 174 N.E.3d 713, ¶ 10 (the litigation privilege provides absolute immunity from civil suits for defamatory statements that were made during and were relevant to judicial proceedings). This application is consistent with Article I, Section 11 of the Ohio Constitution, which gives citizens the right to free speech but acknowledges that they are "responsible for the abuse of the right." That provision further provides that a person may be criminally prosecuted for libel—i.e., a defamatory statement

that has been published, *see* R.C. 2739.01—but must be acquitted if the jury finds that the statement was true and published with good motives for justifiable ends. Article I, Section 11, Ohio Constitution.

*2. The litigation privilege does not shield a person from being held criminally liable for tampering with records*

{¶ 24} Brown argues that the litigation privilege could extend to shield a person from criminal charges when the offense requires the defendant to have acted without "privilege." Brown points us to the Wisconsin Supreme Court's decision in *State v. Cardenas-Hernandez*, 219 Wis.2d 516, 579 N.W.2d 678 (1998), to support this position. Under Wis.Stat. Section 942.01(3), a person whose "communication [is] otherwise privileged" is shielded from prosecution for criminal defamation. *Id*. at ¶ 38. Based on the legislative history of that statute, the Wisconsin Supreme Court held that the common-law privilege of absolute immunity protects a person who makes defamatory statements in a legal proceeding from prosecution for criminal defamation just as it would protect that person from a civil defamation action, because the communication was made in an "otherwise privileged" context. *Id*. at ¶ 38-43.

{¶ 25} We acknowledge that R.C. 2913.42(A)(1) and Wisconsin's criminal-defamation statute both allow a person to avoid criminal liability if the person makes a statement that is privileged. But Brown has not provided, nor can we find, any legislative history in Ohio to support her argument that the litigation privilege extends beyond protecting a person from civil liability for a defamatory statement that was made during a judicial proceeding and was reasonably related to that proceeding. Rather, over 100 years of precedent and Article I, Section 11 of the Ohio Constitution refute Brown's assertion that the common-law litigation privilege shields a person from criminal liability for libelous or perjured statements. *See, e.g.*, *Reister*, at ¶ 10; *Erie Cty. Farmers' Ins. Co.*, 122 Ohio St. at 215, 171 N.E. 97; *Costell v. Toledo Hosp.*, 38 Ohio St.3d 221, 223-224, 527 N.E.2d 858

(1988). Even the Restatement of Torts on absolute immunity makes clear that the litigation privilege does not extend beyond civil defamation actions. *See* 3 Restatement of the Law 2d, Torts, Sections 583, 584, 587, 635 (1977). To extend the litigation privilege into the criminal realm, even for defamatory statements made during a judicial proceeding, would be inconsistent with this court's precedent and Article I, Section 11 of the Ohio Constitution.

{¶ 26} Therefore, we hold that the litigation privilege that shields a person from civil liability for defamatory statements that the person made during a judicial proceeding and were reasonably related to that proceeding does not extend to protect that person from criminal prosecution. *See, e.g.*, *Reister*, 164 Ohio St.3d 546, 2020-Ohio-5484, 174 N.E.3d 713, at ¶ 8, 10, 14; *see also* Article I, Section 11, Ohio Constitution. Accordingly, Brown was not shielded from criminal liability for the statements she made in the quiet-title action that she filed against Hallug, and the First District erred in holding otherwise.

## B. There is sufficient evidence that Brown knew she had no privilege to provide false statements in her filings in the quiet-title action

{¶ 27} Brown argues that even if the litigation privilege does not extend to her false statements, her conviction is based on insufficient evidence because the state did not prove that she made those statements *knowing* that she was without privilege to do so. This argument is without merit.

{¶ 28} Under R.C. 2913.42(A)(1), a person is guilty of tampering with records when that person falsifies a writing or record "knowing the person has no privilege to do so." "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B). Thus, there is sufficient evidence to prove that Brown falsified a writing or a record knowing that she had no privilege to do so if she subjectively believed that there

was a high probability that she did not have a privilege to make a false statement or if she acted with a conscious purpose to avoid learning that fact.

{¶ 29} Beyond the fact that this court has never recognized the litigation privilege as shielding a person from criminal liability for making defamatory statements, the documents that Brown filed in the quiet-title action are evidence that she in fact knew that she had no privilege to make false statements in her filings. Both the complaint to quiet title and the affidavit of indigency contained statements that Brown could be subject to criminal prosecution if she lied in those documents. She signed and filed each document knowing that fact. Looking at this evidence in the light most favorable to the prosecution, the evidence is sufficient to demonstrate that Brown knew that she had no privilege to lie in her filings in the quiet-title action.

{¶ 30} Therefore, Brown's argument that the state did not provide sufficient evidence to prove that she knowingly acted without privilege is without merit. The first assignment of error Brown asserted in the court of appeals concerning the sufficiency of the evidence should have been rejected.

### III. CONCLUSION

{¶ 31} We hold that the litigation privilege does not shield a person from being held criminally liable for false statements that the person made during judicial proceedings and that were reasonably related to the proceedings. We reaffirm that the litigation privilege provides absolute immunity from civil suits only for defamatory statements that were made during judicial proceedings and that were reasonably related to those proceedings. *Reister,* 164 Ohio St.3d 546, 2020-Ohio-5484, 174 N.E.3d 713, at ¶ 10; *Surace*, 25 Ohio St.3d at 233, 495 N.E.2d 939. Thus, the false statements that Brown made in her complaint against Hallug to quiet title and in her affidavit of indigency can form the basis of her conviction for tampering with records in violation of R.C. 2913.42(A)(1), and the court of appeals erred in holding otherwise.

**{¶ 32}** We also find that there was sufficient evidence to prove that Brown acted "knowing she had no privilege to do so" when she filed her quiet-title complaint and affidavit of indigency with admittedly false statements and when she acknowledged in those filings that she could be subject to criminal liability for providing false information therein. Therefore, Brown's first assignment of error on appeal should have been rejected.

**{¶ 33}** For these reasons, we reverse the judgment of the First District Court of Appeals. We remand the cause to the appellate court to resolve Brown's second and third assignments of error.

Judgment reversed
and cause remanded.

O'CONNOR, C.J., and SMITH and BRUNNER, JJ., concur.

KENNEDY, J., concurs in judgment only.

DONNELLY, J., dissents, with an opinion joined by STEWART, J.

JASON P. SMITH, J., of the Fourth District Court of Appeals, sitting for DEWINE, J.

_____

**DONNELLY, J., dissenting.**

**{¶ 34}** Because I would dismiss this appeal as having been improvidently allowed, I dissent. This is not an appropriate case in which to explore the element of "privilege" in the offense of tampering with records in violation of R.C. 2913.42, because tampering with records was not an appropriate charge under the facts of this case.

**{¶ 35}** R.C. 2913.42, which establishes the offense of tampering with records, prohibits the adulteration of a writing or record. That statute states that no person shall "[f]alsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record." R.C. 2913.42(A)(1). The offense of tampering with records "does not refer to the [adulteration of] particular statements

contained in the writing" but refers instead to tampering with the writing or record "as a whole." *Bradley v. Miller*, 96 F.Supp.3d 753, 781 (S.D.Ohio 2015). The concept of a falsified document connotes the genuineness of the document itself rather than the factual truth of the statements contained therein. *See Gilbert v. United States*, 370 U.S. 650, 658, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962), quoting *Marteney v. United States*, 216 F.2d 760, 763-764 (10th Cir.1954) (holding that a document is not a forgery "[w]here the 'falsity lies in the representation of facts, not in the genuineness of execution' ").

{¶ 36} Appellee, Monai Sherea Brown, authored and filed a civil complaint that contained false statements of fact. It would have been proper to charge Brown with perjury, in violation of R.C. 2921.11(A), or falsification, in violation of R.C. 2921.13(A)(1), since both of those offenses prohibit "knowingly mak[ing] a false statement" in an "official proceeding." However, Brown did not tamper with her own original writing. Therefore, she should not have been prosecuted for tampering with records, in violation of R.C. 2913.42(A)(1).

{¶ 37} Neither of the offenses that fit Brown's conduct have an element of lack of privilege. *See* R.C. 2921.11 and 2921.13. There is no point in using this case to analyze the meaning of "privilege" as that term is used in R.C. 2913.42(A). Doing so risks unintended consequences in cases in which charges for tampering with records would actually be appropriate. I would dismiss this appeal as having been improvidently allowed, and I therefore dissent.

STEWART, J., concurs in the foregoing opinion.

_____

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr. and Alex Scott Havlin, Assistant Prosecuting Attorneys, for appellant.

Raymond T. Faller, Hamilton County Public Defender, and David H. Hoffmann, Assistant Public Defender, for appellee.

January Term, 2022

_____